IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| v. | ) No. 07-CR-30011 |
| TIMOTHY W. HUDDLESTON, | ) |
| Defendant. | ) |

REPORT AND RECOMMENDATION

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

  This cause comes before the Court on Defendant's Motion to Quash Arrest and Suppress Evidence (d/e 9) (Motion to Suppress). The motion is fully briefed, and pursuant to Local Rule 72.1, the District Judge has referred the matter to me for an evidentiary hearing and Report and Recommendation. See Text Order, June 21, 2007. After carefully considering the submissions of the parties, hearing evidence on the matter, and pursuant to 28 U.S.C. § 636(b)(1)(B), I recommend that the Motion to Suppress be DENIED for the reasons set forth below.

## I.  BACKGROUND[1]

Defendant Timothy Huddleston is charged in a three-count Indictment (d/e 6) with possession with intent to distribute five or more grams of cocaine base ("crack") (Count 1), unlawful possession of a firearm by a felon (Count 2), and possession of a firearm in furtherance of a drug trafficking crime (Count 3).  This Court held an evidentiary hearing on Huddleston's Motion to Suppress on July 16, 2007.  The Court heard testimony from Tarana White, Officer Christopher Rhodes, Officer Jeffery Larson, and Dorothy White.

Based upon the testimony heard in open court, Huddleston was arrested in the early morning hours of December 30, 2006, after officers with the Springfield Police Department (SPD) found him in possession of a firearm inside a residence located at 1850 South Wirt, Springfield, Illinois ("South Wirt residence").  Tarana White testified that she rents the South Wirt residence from her parents, Dorothy and Walter White, pursuant to a written lease.  The Court admitted Defendant's Ex. 1, which was a copy of the written lease, dated October 15, 2006, that was in effect on December 30, 2006.  According to Tarana, her rent is $400.00 per month.  Tarana testified that she and Huddleston have been involved in a relationship and have a five-year-old son together.

---

[1] **This Report and Recommendation is prepared without the benefit of a transcript.**

Tarana testified that Huddleston was released from prison on October 4, 2006. Huddleston was paroled to his mother's house; however, according to Tarana, Huddleston began staying at the South Wirt residence a couple days after his release from prison. Tarana testified that Huddleston spent almost every night at the South Wirt residence from early October 2006 until his arrest on December 30, 2006. Tarana testified that Huddleston kept clothing, toiletries, and cooking utensils at the South Wirt residence during this time period. According to Tarana, Huddleston helped to pay the utility and cable bills for the South Wirt residence. On cross-examination, Tarana testified that Huddleston was not employed during the time he lived at the South Wirt residence, but Tarana stated that she gave him money to spend. According to Tarana, she did not stay at the South Wirt residence consistently during the October to December 2006 time period, but rather stayed with her parents at their home. Tarana testified that she would stop by the South Wirt residence every day during this time period.

According to Tarana, the South Wirt residence had two exterior doors at the front door, an outer security door and an inner door. Tarana testified that Huddleston had a key to the inner door, but not to the outer security door. Tarana stated that the security door was generally left unlocked and that she did not give Huddleston a key to the security door because, in the event that they were in a fight, she wanted to be able to lock him out of the South Wirt residence.

Tarana testified that she had a key to both doors as did her parents, Dorothy and Walter.

Officer Christopher Rhodes also testified. He stated that he was a patrol officer with the SPD and had been so employed since September 2001. Rhodes testified that he was working in the early morning hours of December 30, 2006, when he was dispatched at approximately 12:43 a.m. to 1850 South Wirt. Rhodes stated that the dispatch was to respond to a "man with a gun" call that had been received. Rhodes testified that he quietly approached the house in his squad car with the headlights turned off based on the nature of the call. Rhodes stated that his fellow officer, Jeffery Larson, arrived by squad car in the same manner. According to Rhodes, after arriving on the scene, he met with the caller, Dorothy White, in the street approximately three houses north of 1850 South Wirt. Rhodes stated that Officers Larson and Dodd were also on the scene. According to Rhodes, Dorothy told him that she owned the house at 1850 South Wirt and that her daughter resided there. Rhodes stated that Dorothy told him that her daughter left the house because she was afraid after Timothy Huddleston threatened her by telephone. According to Rhodes, Dorothy informed him that she had come to check on the South Wirt residence and when she entered the home, she saw Huddleston sitting on the couch, asleep. Rhodes testified that Dorothy told him that she believed that Huddleston was holding what appeared to be "possibly a gun" in his hand. Rhodes stated that

Dorothy told him that she saw what appeared to be the handle of a gun, but that the remainder of the object was concealed under a pillow. According to Rhodes, Dorothy stated that Huddleston was the only one in the South Wirt residence at the time.

Rhodes testified that Dorothy told him that she had the keys to the house and that Huddleston did not have permission to be there and had not been staying there. According to Rhodes, Dorothy gave the officers permission to enter the South Wirt residence. Rhodes further testified that, when Dorothy identified the individual in the house as Tim Huddleston, Rhodes recognized the name. Rhodes stated that he was familiar with Huddleston and knew that his criminal record included a past violent offense. Rhodes testified that Dorothy appeared nervous while they were speaking. He estimated that he spent two to three minutes talking to Dorothy after arriving on the scene. Rhodes stated that, after he finished speaking with Dorothy, he conferred briefly with Officers Larson and Dodd. According to Rhodes, the officers decided to enter the South Wirt residence and take control of Huddleston. Rhodes testified that based on the information he had about Huddleston's past, the possible gun, and the threats to Tarana, he felt that the officers needed to act quickly for officer safety and the safety of the neighborhood.

Rhodes testified that the three officers entered the residence. Rhodes acknowledged that the officers did not take any steps to attempt to obtain a

warrant prior to entering the South Wirt residence. According to Rhodes, Officers Larson and Dodd entered with their weapons drawn and he entered with his Taser drawn. Rhodes stated that when the officers entered the residence, Huddleston was asleep on the couch wearing a winter coat and gloves. Rhodes testified that Officers Larson and Dodd holstered their weapons when they decided to go "hands on" with Huddleston. According to Rhodes, the officers grabbed Huddleston's hand and removed a loaded .44 Magnum Ruger revolver. Rhodes stated that Huddleston was then placed under arrest. According to Rhodes, after Huddleston was arrested, Rhodes spoke to Tarana by telephone regarding the threats she had received.

     Officer Jeffery Larson also testified. Larson stated that he has been a patrol officer with SPD since July 1999. Larson testified that, in the early morning hours of December 30, 2006, he responded to a dispatch to 1850 South Wirt regarding a man with a gun. He stated that he approached the residence in his squad car with the headlights out. According to Larson, when he arrived on the scene, he overheard Officer Rhodes speaking with Dorothy White. Larson stated that Dorothy looked scared and sounded nervous during the conversation. According to Larson, Dorothy stated that Huddleston had a possible handgun. Larson testified that Rhodes informed the other officers that Dorothy had given them permission to enter the South Wirt residence and the officers formed a plan

3:07-cr-30011-JES-BGC    # 18    Page 7 of 18

to enter and subdue Huddleston. Larson testified that Rhodes also informed him that Huddleston had a prior offense involving the discharge of a firearm.

Larson stated that he was the first officer to enter the South Wirt residence. According to Larson, he looked inside the front door before the officers entered the house and saw an African-American male who appeared to be asleep sitting on a sofa with his hands under a pillow. Larson also stated that he heard the male snoring. Larson stated that the officers announced "Springfield Police Department" and received no response. According to Larson, at that point, the officers entered the residence with their weapons drawn. Larson testified that when he entered the residence, he saw the handle of a firearm in Huddleston's hand. According to Larson, after entering the residence, he and Officer Dodd secured Huddleston's hand and removed a revolver with an approximately ten-inch barrel.

Finally, the Court heard testimony from Dorothy White. Dorothy stated that she met Huddleston through her daughter and that she also knew Huddleston's mother and had spoken with her a few days prior to the hearing. Dorothy testified that she and her husband Walter have owned the South Wirt residence for approximately thirty years. Dorothy stated that she and Walter live at 4212 Deming Drive and rent the South Wirt residence to their daughter Tarana. Dorothy testified that in late December 2006, however, Tarana was staying with

Dorothy and Walter at their Deming Drive home because Tarana and Huddleston were fighting.

During the evening of December 29, 2006, Dorothy overhead Huddleston threaten to send Tarana home in a body bag. According to Dorothy, Huddleston made this threat by telephone. Dorothy stated that Huddleston was upset because he wanted Tarana to pick him up when she got off of work but she refused. According to Dorothy, Tarana was working on the evening of December 29, 2006 and got off work at approximately 10:00 p.m. Dorothy stated that Tarana arrived at the Deming Drive residence at approximately 10:30 p.m. that evening.

Dorothy testified that in the early morning hours of December 30, 2006, she went to the South Wirt residence to lock the security door to lock Huddleston out. Dorothy stated that she knew that Huddleston had a key to the interior door, but that he did not have a key to the security door because they had a limited number of keys to the security door and duplicates were hard to come by. According to Dorothy, she did not think that anyone would be at the South Wirt residence and she would not have gone to the residence had she known that Huddleston was there. Dorothy testified that when she arrived at the South Wirt residence she opened the door and walked in. According to Dorothy, at that point, she saw Huddleston asleep on the couch. Dorothy testified that she observed approximately three inches of what appeared to be the handle of a gun

in Huddleston's hand. Dorothy stated that she was startled to see Huddleston and immediately exited the house and called the police. Dorothy testified that she did not use 9-1-1 to contact the police because she did not believe that it was an emergency situation.

Dorothy stated that when the police arrived, she told the officers about the threats Huddleston had made to Tarana. According to Dorothy, she informed the officers that the door was open and that she wanted Huddleston removed from the South Wirt residence. Dorothy testified that she told the officers that Huddleston had what appeared to be a gun in his hand. According to Dorothy, one of the officers questioned her about the perimeter and she responded, "don't worry, he's not going anywhere because he is asleep." On cross-examination, Dorothy testified she gave law enforcement permission to enter the residence.

## II. ANALYSIS AND CONCLUSIONS OF LAW

The Fourth Amendment to the Constitution guarantees the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Huddleston asserts that the officers' warrantless entry into the South Wirt residence was unreasonable because Dorothy White lacked authority to consent to the entry and that there were no exigent circumstances sufficient to justify a warrantless entry. "The Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects."

Illinois v. Rodriguez, 497 U.S. 177, 181 (1990). A defendant seeking to suppress evidence because of a violation of the Fourth Amendment must first establish that he has standing to challenge the search or seizure. United States v. Sweeney, 688 F.2d 1131, 1143 (7th Cir. 1982). Once the defendant has established standing in a case in which law enforcement officers conducted a warrantless search, the burden of proof shifts to the government, because warrantless searches are "per se unreasonable under the Fourth Amendment-subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967). At that point, the Government bears the burden of establishing by a preponderance of the evidence that an exception to the warrant requirement applies. United States v. Basinski, 226 F.3d 829, 833 (7th Cir. 2000).

In the instant case, as stated of record, this Court believes that, based on the evidence presented, Huddleston has Fourth Amendment standing to challenge the search at issue. The Court, relying on Minnesota v. Olsen, 495 U.S. 91 (1990), noted that the evidence presented through witness Tarana White was sufficient to establish that Huddleston had a subjective expectation of privacy in the South Wirt residence that was objectively reasonable. Thus, the Court recommends a finding that Huddleston has standing, at which point the burden shifts to the Government to establish, by a preponderance of the evidence, that an exception to the warrant requirement applies.

It is undisputed that the law enforcement officers entered the South Wirt residence without a warrant and without the consent of either Huddleston or Tarana White. The Government asserts that the entry was nevertheless valid because (1) Dorothy White had apparent authority to consent to the entry and/or (2) the entry was justified by exigent circumstances. The Court turns to an analysis of each of these bases.

A.  Apparent Authority

It has been long established that the Fourth Amendment prohibition against warrantless entry does not apply to situations in which voluntary consent has been obtained, either from the individual whose property is searched or from a third party who possesses common authority over the premises. Rodriguez, 497 U.S. at 181. In Rodriguez, the Supreme Court expressly extended this exception to include instances in which officers entered a home without a warrant because they reasonably, though erroneously, believed that the person who consented to their entry had authority to do so. The Rodriguez Court noted, "[a]s with other factual determinations bearing upon search and seizure, determination of consent to enter must be judged against an objective standard: would the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?" Id. at 188 (internal quotations and citations omitted). Applying this standard to the facts of the instant case, the Court believes that the officers were reasonable in believing

that Dorothy White had authority to consent to their entry into the South Wirt residence.

It is clear that Dorothy White owned the South Wirt residence with her husband Walter. The Supreme Court has held, however, that common authority is not to be implied from a mere property interest in the property at issue, noting that the authority which justifies third-party consent does not rest on the law of property. United States v. Matlock, 415 U.S. 164, 171 n.7 (1974). The Seventh Circuit has recently held that the relevant inquiry in cases involving apparent authority to consent is whether the third party would have appeared to a reasonable officer to have joint access or control of the premises for most purposes. United States v. Groves, 470 F.3d 311, 319 (7th Cir. 2006). The Court must consider what the officers knew at the time they received consent and whether those facts were sufficient to demonstrate that the officers reasonably, even if erroneously, believed that the third party possessed common authority. Id. Facts that come to light after the search began cannot reasonably have influenced the officers' beliefs regarding whether the third party possessed apparent authority to consent. Id. The Court notes that there is no evidence that any of the facts to which Tarana testified relating to Huddleston's legal standing herein were known to the officers at the time that they entered the South Wirt residence.

The Seventh Circuit in Groves set out a list of factors that mitigate in favor of finding actual or apparent authority, but noted that the list was not exhaustive and was not meant to be used as a checklist of factors. Id. at 319 n.3. These factors include possession of a key to the premises, a person's admission that he or she lives at the residence in question, possession of a driver's license listing the residence as the driver's legal address, receiving mail and bills at that residence, keeping clothing at the residence, having one's children reside at that address, keeping personal belongings at the residence, performing household chores at the home, being on the lease for the premises and/or paying rent, and being allowed into the home when the owner is not present. Id. at 319

In the instant case, it is clear that Dorothy did not purport to live at the South Wirt residence herself. However, Dorothy informed the officers that she rented the South Wirt residence to her daughter, resulting in a closer relationship than that of an ordinary landlord and tenant. Officer Rhodes testified that Dorothy informed him that her daughter resided at the South Wirt residence but was staying with her parents because she was afraid. Dorothy told the officers that, earlier that evening, Huddleston had threatened to send Tarana home in a body bag and that Dorothy had overheard the threat. Dorothy further informed the officers that she had keys to the South Wirt residence and had gone to the residence to check on things and lock it up. Significantly, Dorothy informed the officers that she had just entered the house and exited when she saw

Huddleston and that Huddleston did not have permission to be in the residence. Dorothy informed the officers that Huddleston had not been staying at the residence and asked that he be removed. There was no indication in any information that the police officers had prior to entering the South Wirt residence that Huddleston lived at the residence or had permission to be there. Dorothy's representations, taken as a whole, present a believable and reasonably complete picture of her authority to consent to an entry into the South Wirt residence. The Court is cognizant of the fact that in some instances, Rodriguez imposes a duty on law enforcement officers to inquire further as to a third party's authority to consent to a search if the surrounding circumstances make that person's authority questionable. See Rodriguez, 497 U.S. at 188-189. However, there is nothing in the record in the instant case that would have made further inquiry necessary. Indeed, if anything, the surrounding circumstances described on the record bolster Dorothy's representations that Huddleston did not live at the house and did not have permission to be there. For example, Officer Larson testified that when he looked into the residence he observed Huddleston sitting up on the couch asleep, and the record reflects that Huddleston was wearing a winter coat, hat, and gloves as he slept sitting up on the couch indicative of a temporary not permanent occupant. The Court recognizes that officers in the field must react quickly in potentially dangerous situations. Taken as a whole, the facts known to the officers at the time of the entry into the residence support a reasonable

conclusion that Dorothy had authority to consent to their entry into the residence. Therefore, this Court recommends that the Motion to Suppress be denied under the apparent authority consent exception to the warrant requirement.

B.  Exigent Circumstances

In the alternative, the Court believes that the search at issue was justified under the exigent circumstances exception to the warrant requirement. In Payton v. New York, 445 U.S. 573 (1980), the Supreme Court held that, in general, a suspect should not be arrested in his house without an arrest warrant, even though there is probable cause to arrest him. The Payton Court, however, expressly left open the question of whether the warrantless entry to effect Payton's arrest might have been justified by exigent circumstances. Id. at 582-83. The Supreme Court had the opportunity to analyze the existence of exigent circumstances in Olson, noting that a warrantless intrusion may be justified by hot pursuit of a fleeing felon, imminent destruction of evidence, the need to prevent a suspect's escape, or the risk of danger to the police or to other persons inside or outside the dwelling. Olson, 495 U.S. at 100.

"[W]arrantless searches are permissible when police have a reasonable belief that exigent circumstances require immediate action and there is no time to obtain a warrant." United States v. Kempf, 400 F.3d 501, 503 (7th Cir. 2005). The Seventh Circuit has recognized that "[e]xigent circumstances exist when there is a reasonable belief by police that their safety, or the safety of the public,

may be threatened." United States v. Webb, 83 F.3d 913, 916 (7th Cir. 1996) (citing United States v. Hardy, 52 F.3d 147, 149 (7th Cir. 1995)).  As is normally the case for Fourth Amendment inquiries, the test is an objective one; police officers' subjective belief that exigent circumstances exist alone is insufficient to justify a warrantless search.

As an initial matter, the Court notes that, under Illinois law, a person commits the class A misdemeanor of criminal trespass to residence if "without authority, he knowingly enters or remains within any residence."  720 ILCS 5/19-4.  Dorothy informed the officers that Huddleston had threatened Tarana, the tenant at the South Wirt residence, and that he did not have permission to be in the residence.  Dorothy, the lessor of the residence, asked the police to remove Huddleston from the property.  As Huddleston correctly points out, the instant case is distinguishable from many cases in which courts have found exigent circumstances to exist because the evidence reveals that, at the time the officers entered the South Wirt residence, they had been informed that Huddleston was the only person in the residence and that he was asleep.  However, the officers had also been informed that Huddleston had recently threatened Tarana, was sleeping sitting up on the couch, and had what appeared to be a gun in his hand.  Additionally, Officer Rhodes knew that Huddleston had a criminal record that included a prior offense involving the discharge of a firearm.  Although the officers had been informed that Tarana was safely at her

parents' home and that no one else was in the South Wirt residence, it was nevertheless reasonable for the officers to conclude based on the facts before them that, should Huddleston awaken, he posed a threat both to them and to others in the neighborhood.  Officer safety has been recognized as a valid consideration in exigent circumstance cases.  See, e.g., United States v. Hardy, 52 F.3d 147 (7th Cir. 1995) (considering danger to law enforcement officers as well as to other occupants of the motel room).

    The instant case raises safety concerns similar to those considered in the Seventh Circuit's decision in Webb.  Webb, 83 F.3d 913.  In Webb, an officer observed the defendant aim a shotgun at another individual, toss the shotgun into the trunk of a car that was parked at a tavern, and slam the lid of the trunk without removing the keys from the lock.  Id. at 915.  The Seventh Circuit determined that law enforcement officers were justified in opening the trunk to retrieve the weapon without a warrant under the exigent circumstances exception.  Id. at 917.  The Court noted that, because the keys were in the trunk, the gun was easily accessible and furthermore, it was unknown whether the gun's safety mechanism had been activated.  Id.

    In the instant case, the officers knew that Huddleston had a criminal record that included a prior offense involving the discharge of a firearm and that he had recently threatened to send Tarana home in a body bag.  Although Huddleston was asleep, he was sleeping sitting up on a couch in the front room of the

residence. Based on the information provided to officers, not only did Huddleston have access to a gun, he was holding one in his hand. The South Wirt residence was located in a neighborhood with other homes nearby. For these reasons, the Court believes that it was reasonable for the officers to believe that immediate action was required and that there was no time to obtain a warrant prior to entering the residence. I recommend that the Motion to Suppress be denied on this basis as well.

### III. CONCLUSION

For all the above reasons, I recommend that Defendant's Motion to Quash Arrest and Suppress Evidence (d/e 9) be DENIED.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within ten working days after being served with a copy of this Report and Recommendation. See 28 U.S.C. § 636(b)(1). Failure to file a timely objection will constitute a waiver of objections on appeal. See Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986). See Local Rule 72.2.

ENTER:   July 19, 2007

s/ Byron G. Cudmore
_____
BYRON G. CUDMORE
UNITED STATES MAGISTRATE JUDGE